UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

UNITED STATES,

-against-

**SENTENCING**
**MEMORANDUM**
**1:20-CR-00335-TJM**

JACOB DELANEY,

Defendant.

## Preliminary Statement

Jacob Delaney is before the Court for sentencing after pleading guilty to child pornography offenses of receipt (count 1) under 18 U.S.C. §§ 2252A(a)(2)(A) and 2252A(b)(1) and possession counts (counts 2-4) under 18 U.S.C. §§ 2252A(a)(5)(B) and 2252A(b)(2). The court is familiar with this kind of case but does not know Jacob. As a result, we have undertaken a letter writing campaign to introduce Jacob to you. Accompanying this memorandum are 32 letters from those who know Jacob best. They raised him, coached him, taught him, played with him, grew up with him, and all continue to love and support him. Jacob is a son, brother, nephew, and friend to many, and they collectively certify to the court, in no uncertain terms and with full knowledge of Jacob's conduct, that Jacob has virtually unlimited support and a robust accountability apparatus around him to ensure that he can thrive in the future and that he will not reoffend.

1

Further, while the court is familiar with this kind of case, the court does not know why Jacob engaged in the conduct that brings him here for sentencing. Indeed, Jacob and his family did not know how or why he engaged in this conduct at the outset of this process. Through this memorandum and the accompanying reports from those that have been providing Jacob with expert counseling, psychological care, and evaluation, we help the court understand how and why this conduct occurred. In short, this information reveals ████████████████████ ████████████████████████████████████████, and sought answers through the internet where he was introduced to and obtained the contraband he now faces sentencing for receiving and possessing. As described below, and what cannot be lost in this case, is that Jacob was only 16 years old when he began obtaining the contraband. He was a child looking for answers, not victims to exploit.

Nonetheless, Jacob, ██████████████████, understands the wrongfulness of what he has done and admitted culpability and responsibility during his first interview with law enforcement more than two years ago in December of 2019. Since his arrest, Jacob and his family have spared no effort or expense in making sure that Jacob has every resource to fix what caused him to engage in this conduct and to ensure he can succeed in the future.

For these reasons and the legal arguments made in more detail below, we ask the court to impose the mandatory minimum term of imprisonment of five years as such a sentence is sufficient but not greater than necessary to account for the seriousness of the crime, to provide adequate deterrence, and afford Jacob any needed treatment. 18 U.S.C. § 3553(a).

## **Meet Jacob**

Jacob is 24 years old but had just turned 22 and was student at SUNY New Paltz at the time of his arrest.  He is a gifted skier, baker, and dog lover. He has an infectious, understated sense of humor, and "contagious laughter" (Kyle Shanahan Letter at 1-2; Kaitlyn Shanahan Letter at 1). Jacob is "responsible", "polite", and "kind". (Christine M. Kollmer Letter). He is a "most gentle soul" (Gina Woloshin Letter) who is the "kindest and most thoughtful young man". (Cecilia Bach Letter). The superlatives for Jacob have no end. We invite the court to review each of the letters as each, in its own way, demonstrates that Jacob is not just loved and supported by those around him, he is cherished.

With all the fun, love, and support Jacob gave and received, he nonetheless struggled ███████████████████████████████ ███████████████████████████████████████. (PSR at ¶¶ 19, 20). ████████████████████████████████████████ ████████████████████████████  ████████████████

 This journey led him from one website to another. In so doing, Jacob began obtaining contraband images when he was still a child himself. (PSR at ¶ 20).

When he arrived at college, Jacob began using marijuana heavily to reduce his stress and anxiety that largely manifested because of his ██████████ ███████████████████████████████ Jacob's marijuana abuse reflects a young man struggling with ████████████████ ███████

Since his arrest, Jacob has accepted responsibility for his actions and sought to show the court that he has learned his lesson and does not need an overwhelming punishment to deter him. The PSR makes clear that Jacob understands the wrongfulness of what he has done but Jacob has also provided the court with a letter that demonstrates, in his own words, his acknowledgement of the harm he has caused while also providing insight into why he engaged in the conduct at issue. (*See* Exhibit "B", Letter of Jacob Delaney).

Jacob has also been under house arrest with electronic monitoring since December 2019 and has complied with every requirement from Pretrial Services including maintaining employment, reporting as directed, and attending mental health treatment. (PSR at ¶12). He has sought and obtained ██████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████

Attached as Exhibit "C" is a letter from ████████████████████ ████████████████████████ since January of 2020.  Attached as Exhibit "D" is a letter from ████████████████████████

████████████████████████████. ████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████

██

Jacob is also a reliable and good employee. Despite the challenges the charges and his guilty plea created, Jacob found and maintained employment at

HomeSense where he excelled. Jacob was promoted to a supervisory role, recognized as the associate of the Quarter, and routinely received praise from his supervisors for his diligence, work ethic, and integrity. The commendations Jacob received from HomeSense are attached as Exhibit "E".

What the court should take away from Jacob's past, the conduct that brings him before the court, and his behavior following his arrest, is that Jacob can be trusted to do the right thing going forward. He will find, maintain, and excel at work. He will get help when he needs it. He will follow the terms and conditions imposed by the court. He has limitless family support to encourage him and hold him accountable. As a result of his personal background and characteristics, the mandatory minimum sentence is more than sufficient.

## Jacob is Not a Threat

Jacob has demonstrated through his conduct since his arrest that he is not a threat to reoffend. More importantly, however, Jacob has ███████████

████████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

██████████████████████████████████████

███████████████████████████████████████

with a relapse prevention component." (*Id*.). Dr. Bashkoff further found that Jacob

scored a 0, a low risk to reoffend, on the 13-Factor Stable-2007 test for recidivism.

(Ex. "A" at 4-7). Likewise, on the Hanson Sex Attitudes Questionnaire, which

assess a subject's attitudes associated with child molestation, Jacob was

determined to "understand the age of consent and the boundaries protecting

underage children from having sexual activity with adults. He is aware of the legal

and emotional boundaries protecting children from sexual contact with adults." (*Id*.

at 7). Dr. Bashkoff analysis also found no evidence "of sadistic, violent, coercive

or masochistic sexual activities" (*Id*.), that Jacob was "open and honest

and…willing to admit to personality deficits and current psychosocial stressors."

(*Id*. at 8). Importantly, Dr. Bashkoff determined that Jacob has several "supportive

factors, which reduces his risk to reoffend." (*Id*. at 10).

██████████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████████████

observation is supported by the United States Sentencing Commission's own

findings. In 2012 the Commission published a study that showed the sexual

recidivism rate for non-production offenders was 7.4% (45 out of 610 cases

studied), which was dramatically below the 31% recidivism rate for all federal

offenders.[1] (*See* Exhibit "F", 2012 Sentencing Commission Report at 300). The bottom line is that based on his conduct, Jacob is statistically not likely to reoffend, but more importantly, his background, personal characteristics, support network, and post-arrest conduct all demonstrate that he will not reoffend and that he can and will continue to seek help and counseling necessary to further reduce any unresolved concern. Therefore, a mandatory minimum sentence is more than necessary to provide Jacob with necessary treatment and deter him from reoffending.

### A Below Guideline Sentence is Necessary to Avoid Unjust Sentencing Disparities

The United States Sentencing Commission ("Commission") has conclusively found sentencing disparities in non-production child pornography cases. In June of 2021, the Commission issued a report, *Federal Sentencing of Child Pornography: Non-Production Offenses* (hereinafter the "Report") on various trends and issues occurring in non-production child pornography offenses. The Report is attached as Exhibit "G". The Report updated and expanded upon a similar report drafted by the Commission in 2012 titled *2012 Child Pornography*

---

[1] The Commission has reported elsewhere that that 49.3% of all offenders are rearrested and 31.7% are reconvicted within the report's 8-year follow-up period. *See Recidivism Among Offenders: Comprehensive Overview*, available at: https://www.ussc.gov/research/research-reports/recidivism-among-federal-offenders-comprehensive-overview last visited April 15, 2022.

*Report to the Congress: Federal Child Pornography Offenses, supra*. We draw the court's attention to the following key findings and recommendations from the Report.

First, since 18 U.S.C. § 3553(a)(6) requires the court to "avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct" and such a factor can warrant a sentence below the guideline range, we note that the Report established that the

> …non-production child pornography guideline has been subject to longstanding criticism from stakeholders and has one of the lowest rates of within-guideline range sentences each year. Courts increasingly apply downward variances in response to the high guideline ranges that now apply to the typical non-production child pornography offender, although sentences remain lengthy.

(Ex. "G" at 23). Notably, the number of guideline range sentences for non-production cases has decreased rapidly since 2005, reaching a peak of 60% of all non-production cases in 2017. (*Id*. at 24). This is consistent with the present data for the Second Circuit where downward variances were applied in 60.8% of **all** child pornography cases, including production and distribution cases. *See United States Sentencing Commission Statistical Information Packet for Fiscal Year 2020, Second Circuit*, Exhibit "H", at 18, Tbl. 10). The Report also found that while average guideline range for non-production offenses was 138 months, the average sentence imposed with either a government sponsored departure, or a judicial variance was

85 and 82 months respectively. (Ex. "G" at 25). Thus, judicial variances in non-production cases dramatically reduce defendants' sentences from the guideline range by 56 months (4.6 years) on average.

Second, the Report found sentencing disparities among possession and receipt offenders in non-production cases where receipt offenders received a higher sentence despite the offenders **engaging in essentially the same conduct**. (*Id*. at 49). This is because a possession offense has a level 18 base offense level whereas receipt's base offense level 22. *Cf* U.S.S.G. § 2G2.2(a)(1) and U.S.S.G. § 2G2.2(a)(2). This disparate guideline starting point results in a near doubling of an offender's guideline exposure from 27-33 months at a level 18 to 41-51 months at level 22.[2] The disparity also exists because receipt requires a five-year mandatory minimum sentence whereas possession does not. 18 U.S.C. § 2252A(b)(1). Unsurprisingly but frustratingly, the Report found that for 171 similarly situated receipt and possession offenders, the average receipt offender's sentence was 34 months longer than the average possession offender despite engaging in the same conduct. *Id*. at 56.

Third, the concerns raised in the Report are not new to the courts. Five years before the Report was published, the Second Circuit observed in *United States v.*

---

[2] The Report also found that receipt offenders overwhelmingly ended with a higher offense level of 30 (97-121 months) with a mandatory minimum sentence of 60 months whereas possession offenders ended at a level 28 (78-97 months) and no mandatory minimum. *Id*. at 53-55.

*Jenkins*, 854 F.3d 181 (2d Cir. 2017) that the U.S.S.G § 2G2.2's enhancements are "all-but-inherent" to all child pornography offenses and create a guideline sentence from "outdated enhancements." *Jenkins*, 854 F. 3d at 189-90 (internal quotation omitted); *accord United States v. Dorvee*, 616 F. 3d 174, 184 (2d Cir. 2010). As the Report noted, "the conduct covered by four of the six enhancements – accounting for a combined 13 offense levels – has become so ubiquitous that they now apply to the vast majority of cases sentenced under § 2G2.2." (Ex. "G" at 69).

Jacob's case falls into the sentencing trap described by the Report and recognized in *Jenkins*. Like nearly every other non-production offender, Jacob downloaded contraband images from the internet, making him guilty of a receipt offense and subject to the arbitrarily increased sentencing enhancements. If the "all-but-inherent" enhancements are removed from the sentencing calculations, however, Jacob would have a base offense level of 41-51 months as a receipt offender. Considering the Report's findings, and the routine circumstances this case presents, the court should treat this case for what it is: a run-of-the-mill child pornography case that requires a sentence well below the guideline range. Furthermore, since these concerns are not new to the Commission, Second Circuit, or apparently other sentencing courts, there is clearly a basis for a substantial downward variance in this case solely to avoid unjust sentencing disparities with other similar matters.

To this end, we note that this court downwardly departed significantly in a remarkably similar matter. In *United States v. Feminella*, 3:17-cr-00075-001 (N.D.NY. 2017), this court sentenced a 21-year-old male college student to 72 months on Transportation (18 U.S.C. §1152(a)(a) and 2252A(b)(10)) and Receipt counts when the guideline range, after acceptance of responsibility was 151-188 months. In *Feminella*, the defendant's guideline range was a 34, compared to Jacob's 30 because the defendant received a 2-level transportation enhancement and did not receive a 2-level reduction for receipt only under U.S.S.G. § 2G2.2(b)(1).  In fact, a downward departure to the mandatory minimum here is even less of a departure than the court-awarded in *Feminella* (79-month reduction from low end of guideline range in *Feminella* compared to 37-month reduction here).  A mandatory minimum sentence is therefore appropriate to avoid unjust sentencing disparities as required by 18 U.S.C. § 3553(a)(6).

### Restitution, Fines, Special Assessments, and Financial Consequences:

As reflected in the PSR and plea agreement, Jacob, despite his modest financial resources, has agreed to pay restitution to qualifying victims. Four victims have requested restitution. Three seek $5,000 separately and a fourth seeks $9,000, for a total of $24,000. To qualify for restitution pursuant to 18 U.S.C. § 2259, the government must establish that the losses are among those qualifying

under the definition for loss set forth in 18 U.S.C. § 2259(c)(2) such as medical services. In addition, "[a] victim's total aggregate recovery pursuant to this section shall not exceed the full amount of the victim's demonstrated losses." 18 U.S.C. § 2259(b)(2)(C). Unless the government can show the victims have not already been sufficiently compensated for qualifying restitution, no restitution can be ordered, even the minimum $3,000 described in 18 U.S.C. § 2259(b)(2)(B) would be unauthorized.

In the event the court determines that restitution is owed to these victims, due to Jacob's limited financial means and the fact that he did not create, sell, market, or redistribute the contraband images associated with these victims, we believe that the harm Jacob has caused each victim is justly compensated by $3,000. The court should also know that starting in January 2022 we attempted to speak with victim's counsel, by phone, email, letter, and with the assistance of the Government, to explore whether a presentence negotiated resolution could be achieved. The relevant emails and letters demonstrating these efforts are attached as Exhibit "I". We first heard back from victim's counsel on April 19, 2022. If an agreement is reached, we will advise the court accordingly.

We also ask the court to recognize that Jacob is indigent and unable to pay any additional assessment or fine. Specifically, we ask the court to not impose any special assessment that Jacob is subject to under 18 U.S.C § 2259A because he is

13

unable to pay the assessment. § 2259A provides that "[i]n determining the amount of the assessment under subsection (a), the court shall consider the factors set forth in sections 3553(a) and 3572." § 3572(a) includes consideration of the defendant's income, earning capacity, and financial resources as well as the burden that the financial penalty will impose upon the defendant. While Jacob is represented by retained counsel, the funds came from his parents. Without his parent's assistance, Jacob would have qualified for appointed counsel. PSR demonstrates that Jacob has $6,267 in assets with $1,177 in debts (PSR at ¶ 61) and is unable to pay a fine (PSR § 64). Further, while imprisoned, Jacob will not be able to earn any meaningful income and faces a variety of obstacles to employment because of mandatory sex offender registration and reporting in addition to limitations that may be required by the terms of his supervised release. We also object to any special assessment under the Justice for Victims of Trafficking Act of 2015 because the statutory basis for this Additional Special Assessment under 18 U.S.C. § 3014 expired on March 11, 2022.   In sum, due to Jacob's indigency and the possibility that he will be required to pay restitution, we request that the court not impose any other kind of fine or financial penalty on Jacob.

## <u>Objections to Recommended Term and Conditions of Supervised Release</u>

The PSR notes that the guidelines recommend a life-time term of supervised release, but no specific recommendation is made by Probation. (PSR at ¶ 72 *citing* U.S.S.G. § 5D1.2). A sentence, however, is not presumptively reasonable simply because it is consistent with a policy statement. *United States v. Hayes*, 445 F.3d 536, 537 (2d Cir. 2006). Applying a blanket policy position here when not supported by any individualized factual or risk assessment is not appropriate for a non-production case for a young offender with no prior criminal history, total compliance with a lengthy term of pretrial supervision, a bright future, and a deeply supportive and devoted family and support network. In fact, in *Jenkins*, the Second Circuit overturned a 25-year term of supervised release for an offender convicted of transporting child pornography and who had a host of other aggravating factors not at issue here. *Jenkins*, 854 F. 3d at 194. Since a lifetime of supervised release cannot be supported by any rationale, it cannot be imposed here. Rather, we propose a 10-year term of supervised release. This duration is rational as it is twice the minimum term, and even if Jacob were sentenced to the five-year minimum, he would either be imprisoned or on supervised release until he was 39 years old. As a non-production offender who has diligently engaged in treatment and abided by all terms of lengthy pretrial supervision, 10-years is a rational term of supervised release.

We also object to Special Conditions 1 and 3 as being overly broad and vague, not related to the underlying conduct, and contrary to the Second Circuit's holding in *Jenkins*. Special Condition 1 states

> You shall not have direct contact with any child you know or reasonably should know to be under the age of 18, without the permission of the probation officer. If you do have any direct contact with any child you know or reasonably should know to be under the age of 18, without the permission of the probation officer, you shall report this contact to the probation officer within 24 hours. Direct contact includes written communication, electronic communication, in-person communication, or physical contact. Direct contact does not include incidental contact during ordinary daily activities in public places.

(PSR at pg. 19). This condition is almost identical to the special condition found improper in *Jenkins* that "prohibited Jenkins from having direct contact with anyone under the age of 18 unless supervised by a person approved by the probation office." *Jenkins*, 854 F.3d at 194. Like the Second Circuit found in *Jenkins*, Special Condition 1 prohibits Jacob from having any contact with family members or friends "unless he goes through a preapproval process with the Probation Office which presumably would entail some sort of investigation and finding by that office" with no evidence of any actual improper contact or attempted outreach to a minor. *Id*. Since the Second Circuit in *Jenkins* found this same condition part of a "substantively unreasonable" sentence, the court should likewise not impose this Special Condition 1 here. *Id*.

16

We also object to Special Condition 3 as it is too vague, broad, and subjective for Jacob to be on notice of when he may violate this condition. Special Condition 3 requires that "[y]ou shall not go to, or remain at, a place for the primary purpose of observing or contacting children under the age of 18." (PSR at pg. 19). This special condition means anything and nothing and is based on entirely subjective standards that can be arbitrarily applied and enforced. Importantly, the condition does not put Jacob on notice of what he can and cannot lawfully do. As a result, we request the court not impose Special Condition 3.

## Voluntary Surrender

Should the court not grant our request for bail pending appeal (which will be made in a separate application), we request that Jacob be permitted to voluntarily surrender. Jacob has no prior criminal history. For 2½ years he has been released on conditions on home confinement with electronic monitoring under the supervision of pretrial services. During that time, he has abided by every term of his supervised release including finding and maintain employment, reporting as directed and attending required mental health treatment. Jacob has also appeared at every court appearance and has not reoffended. This demonstrates that Jacob is not a risk of flight or a danger to the community, making him an excellent candidate for voluntary surrender. *See United States v. Collado*, 2006 WL 2872593 at *3 (S.D.N.Y. Oct. 10, 2006) (defendant a "good candidate for voluntary surrender"

17

where defendant made all court appearances, compliant with all terms and conditions of pretrial release, not a flight risk or danger to community); *United States v. Kogan*, 2019 WL 494013 at *9 (S.D.N.Y Feb. 8, 2019) (same).

Voluntary surrender also avoids a host of unnecessary and punitive transports, quarantines, and transfers between facilities with no or very limited access to programming or mental health treatment. Attached as Exhibit "J" is an affidavit from Joel Sickler, a criminologist who heads the Justice Advocacy Group, who is fully familiar with the Bureau of Prisons (BOP) designation process. Mr. Sickler details the stark difference in what Jacob will experience if remanded on the day of his sentencing versus being permitted to voluntarily surrender to his designated BOP facility.

If remanded at sentencing, Jacob faces a lengthy, winding road of facility transfers that begin at the federal courthouse in Albany, to Albany County Jail, then to the Brooklyn Metropolitan Detention Center then a transfer to USP Canaan Transit Unit, all before Jacob would be transferred to his facility designated by the BOP. (*Id.* at ¶¶ 11-19). At each stop Jacob faces multiple weeks of isolation while he is in quarantine. (*Id.*). What is more is these facilities are still likely on COVID-related lockdowns, meaning that movement is further restricted, isolation is increased, access to programming, mental health treatment and the like are all but

non-existent. Months will go by before Jacob even arrives at his BOP designated facility.

Another troubling collateral consequence to remand is that it would cause the BOP to score Jacob a higher security level than if he were permitted to voluntarily surrender. (*Id*. at ¶ 18). As Mr. Sickler describes, if Jacob is permitted to voluntarily surrender his security level would be *reduced* by 3 points, but he receives no such reduction for remand. (*Id*.). In simple terms, the higher Jacob's security level score, the higher the security facility Jacob will be designated to. (*Id*.). If high enough, a security score can preclude Jacob from being eligible for certain BOP facilities and can thereby "dramatically change a prisoner's proximity to family, access to programming and the harshness of their overall imprisonment." (*Id*.).

The result is that an unnecessary remand will cause Jacob to be needlessly isolated and without access to important mental health care for months, endure multiple quarantines and transfers and may preclude Jacob from getting into a BOP facility that can provide him with access to his family and to the programming he would benefit from. None of this is necessary, helpful, or serves a just purpose when it can be avoided with a voluntary surrender. Until Jacob surrenders, he can stay under house arrest with electronic monitoring all while continuing to receive important mental health counseling and treatment. The court can remain confident

that Jacob will surrender himself to the BOP facility as required as he has abided by every pretrial condition for 2½ years. We therefore request that Jacob be permitted to voluntarily surrender to the facility designated by the BOP.

## Conclusion

Through his acceptance of responsibility, treatment, adherence to the terms of his post release supervision, and the support he has from his family and friends, Jacob has demonstrated that he is not a threat to reoffend. We therefore ask the court impose the mandatory minimum term of imprisonment so that Jacob can return to his family and return to being the productive neighbor he has demonstrated he can be as quickly as possible.

Dated:   Saratoga Springs, New York
      April 22, 2022           Iseman PLLC

                                       By:

                                       Scott Iseman
                                       Attorney for Defendant
                                       Bar Roll No.:  518859
                                       125 High Rock Ave.
                                       Suite 215-H
                                       Saratoga Springs, NY 12866
                                       scott@scottisemanlaw.com